Good morning, and may it please the Court. My name is Tim Everett. I'm before the Court today to represent Mr. Douglas Brown, a citizen and national of Sierra Leone. Mr. Brown is petitioning the Court to review the decision of the Board of Immigration Appeals denying his application for asylum in the United States. Mr. Brown, in his petition, raises several issues. One of the issues is that the Sierra Leone government did impute a political opinion to him, and did they impute a political opinion to his family as well. Another issue is whether he has a well-founded fear of return to Sierra Leone, considering the documentary evidence in the record and considering his testimony given before the Immigration Court. So you can see there's no past persecution here, so there's no presumption of a well-founded fear, right? Your Honor, to the degree that he was not personally harmed, the only harm to him would have been the emotional hardship from seeing his family members mistreated. And that has not risen to the level of past persecution before the circuit, but we do concede that point. Yes. So the evidence here goes to the question of well-founded fear for future persecution. Yes, Your Honor. Okay. And what is the evidence of imputation of political opinion to him? The evidence regarding that is testimonial and documentary. At the hearing, Mr. Brown testified regarding an investigation by the government of Sierra Leone in his hometown. After the break-in? Exactly, Your Honor. Subsequent to the attempt to free two of the Revolutionary United Front party members in Freetown, that criminal investigation, obviously there were some supposedly criminal overtones for that investigation. But during that investigation, his mother, as Your Honor knows, was mistreated. His brother was detained and mistreated. And apparently his sisters were detained for some period of time. But where is the evidence of imputation of a political opinion? The evidence lies in the manner of the investigation. During the investigation in that town, one Revolutionary United Front member who did not go to Freetown to free the members was killed. The harm, his brother as well, did not go. His brother was severely mistreated to the point where he was spitting up blood. There's a point of contention in the briefs as to whether the brother was detained or not. Our position is that the testimony of evidence shows that he was still detained at the time Mr. Brown left. So the nature of the investigation across the line from prosecutorial to persecutorial, and that nature is what we use as the basis for our claim that there was an imputed political opinion. Furthermore, the documentary evidence is ample in showing that the Sierra Leone government has used similar techniques, uses a very broad net to find individuals and to impute a hostile political opinion to them. And we think considering the documentary evidence, considering the testimonial evidence put together, they do show that someone in Mr. Brown's situation would have a hostile, imputed political opinion attributed to him and thereby would have a well-founded fear of future persecution. I think, and I know the Court has read the briefs, but we don't think this evidence was given proper consideration. And we think if it would have been given proper consideration in the context of his claim, and that claim was clearly stated, it's been clearly stated all the way from the Immigration Court, then the courts, the BIA, the Board of Immigration Appeals or the immigration judge would have had to find, would have been compelled to find that someone in Mr. Brown's situation, that context, then he would have had a well-founded fear of persecution. Roberts. Thank you, counsel. Do you want to save some time for rebuttal? I'll save my time. Thank you. Good morning. May it please the Court. My name is Arthur Rabin. I'm here for the Attorney General. Substantial evidence in this record supports the Board's finding that there was no mixed motive here, that the only reason the police came after the appellate, I'm sorry, the petitioner in this case, is because of the break-in, the possible murder or the killing of the police officer and then the arson outside the prison. We know this from the record because it's in there and the petitioner admits all this. So this is a key date that we have to remember. At no time did the police ever come after a petitioner or his family prior to the April 2nd event, that is, the attempt to break into the prison and the killing and the arson. Well, I guess his argument is that coming after his family was kind of a case of overkill, that they weren't just investigating the break-in, but they were pursuing as well political purposes. What do you say about that? Your Honor, it's hard for me to believe that because what the evidence shows is that the reason the family members were conducting their investigation were searching for Petitioner and his father, the two people who were participating in the criminal event. Petitioner himself in his declaration supporting his asylum application states, he states, and I quote, the soldiers came into town looking for, quote, which of the RUF members had gone to Freetown to free the RUF detainees. That was the sole purpose of the investigation. They were looking for these criminals. I mean, if we assume that this break-in was not done by RUF members, if it were done by anybody else, there would still have been an investigation. There would still, the police would still have come and looked for them for the killing and attempted break-in and arson. So it just so happens that these people were also RUF members. Well, actually, I'm looking at 176 of the transcript, which is, I guess, 284 of the administrative record. He says, my mom told me they came to the town. My father was at his friend's house playing checkers when they heard that soldiers came to town trying to arrest those who support RUF, RUF members and the supporters. Well, that's not your characterization of the testimony. I didn't say the people who committed the arson. It says RUF supporters. Well, I would say that that's a very broad statement, but specifically when he did address to which RUF members they went after, on page 590 to 591 of the record, when he specifically addresses which members they went after, it was the ones that participated in the break-in. Where he states in paragraph number 11, his friend, Emanuel, with whom he was hiding. Are you talking about his asylum application? Yes, sir. Okay. But the testimony, I think the testimony at the hearing is more general. So it's not an unequivocal record. In your favor. I'm not saying it is completely unequivocal, but in light of all the other circumstances here, in light of the fact that there was no prior investigation to RUF members, including his father, who was supposedly this deputy chairman of the party in their little town of Avisa, the fact that only after this incident did they come after him, it shows in light of this other statement where he says they came after only the guys who participated in the break-in. Well, except that, again, around the testimony, the area I'm talking about, he says first his mother tells him they're going after RUF supporters. Emanuel says the soldiers came to look for the supporters, the members of RUF. RUF supporters were taken, and he says two supporters, one guy who, and they took two supporters, one guy who didn't go with us. The guy that didn't go with us to try to release those guys, he was just a supporter. Supporter of what? The RUF party. What do you make of that? No, point taken. I'm not saying the asylum application where he's describing trumps the more expansive oral testimony. I just, well, expansive I think is, I wouldn't call it that. He doesn't explain. He only adds, I think, some supplemental things. It doesn't explain who they went after. You started off with your premise saying there's no evidence in this record, none, that they were going after RUF supporters generally, that they were just going to arrest this person. So he says, no, they were going, he makes a general statement, they were going after RUF supporters, and then he says they took away one guy who wasn't involved in the break-in. It's possible that during the, when they were actually, you know, the net was made broader, but it shows that what the police at least told, well, from what Emanuel told him, what Petitioner understood at the time that, you know, his mind was freshest to the event, which was at the time he made his declaration at the border or at the asylum with the application. Well, the question is then why doesn't this make a colorable case of mixed motive when there is some evidence in the record that supporters of, the RUF supporters who weren't involved in the break-in were taken? Why isn't that enough so that a mixed motive analysis should have been undertaken? I mean, Petitioner might not have won on a mixed motive analysis, but why shouldn't that have been undertaken? Well, because we can't look at what happened to others. We have to look at what happened to him. I mean, it's the prosecutorial motive as to him, not persecutorial. There may have been others who were caught up for other reasons, but as the evidence that applies to Petitioner and his asylum application, how it applies to him, the police went after him because he participated in a criminal event, a clearly criminal event. Well, there's no evidence of that except for what he says, right? I mean, he just recounts they came to the town, they took some people who were supporters, they're looking for RUF supporters. Where's your direct evidence that that's their sole motive? It's inferential, isn't it? That's what you're trying to do. Well, all of this is inferential, I give you that. I'm just going from his earlier statements about what he said, why the police came into the town, as to what happened after they came into town. Fights may have broken out and they took other people who were supporters because obviously. . . Where's the evidence of fights breaking out? Well, at the time. . . No, I'm serious. I'm just looking at what's in the record. I don't want to speculate beyond that. All we have is what's there. Well, what we know is that the reason they went to the prison is because there had been a demonstration in town. Two of their members were taken. They went there to try and free them. And in his declaration, he says they became upset that they could not get into the prison and they started torching cars and, you know, the altercation with the police happened. I don't question that that's at least part of the motive has to be to search for the people who did the damage to the prison. The only question is, is there enough evidence in this record that there's a mixed motive? Well, the only answer I have for you, Your Honor, is that the standard of review controls in this case. That is, the court may have a different interpretation of the facts, but under the statutory standard of review, it doesn't compel reversal. Right. But you started off with the premise there's no evidence in the record. It appears to me that there's some, and I'm asking you to explain why that isn't enough. I would submit, Your Honor, that it is not sufficient to compel reversal based on simply that the other events took place after the police came in to town. That may be one interpretation, and the court may be of that mind, but to reverse the board's interpretation of the facts, the court would have to find that it's compelled by the record, and not merely that there's some evidence or even substantial evidence for it. I would also point to the fact that on, counsel pointed to the documentary evidence in the case in the background country reports that support widespread violence between RUF members and government. On page 575 of the record, it states in the addendum to the asylum profiles that the president of Sierra Leone has emphasized that there is a general amnesty for the so-called little fish, he uses that term, and that only the leaders of the RUF will be tried if taken, and that little fish, even if they had committed grievous crimes, would be released with a warning and possibly just discharged from their jobs. So there is documentary evidence in the record that people such as Petitioner, who may have committed something, would not be, because he's not a leader, in fact, he's not even a member of the RUF, he admits that. It's a security case, yeah. So I see my time is almost up. I would just briefly touch on due process issue here and say that it's not a due process issue, but it's, in fact, just an abuse of discretion issue. Petitioner just takes issue with how the record was examined, and I would just say that the Court should presume that the Board had looked at all the evidence in the record and not just the things he would like for the Board to have looked at. Subject to the Court's questions. Thank you. I don't think there are any further questions. Thank you for your argument. Yes, Your Honor, may it please the Court. In regard to the argument from Respondent, I think it's micro, in a sense, microanalyzing the event, because obviously there was some motive regarding the incident in Freetown to go to the town of Mr. Brown and his family. But once there, it's apparent, and it's apparent from this testimony and it's apparent from the documentary evidence to the past actions of the Sierra Leone government that that was a persecutorial investigation, action, the detention of his brother, the severe mistreatment of his brother. His brother did not go into Freetown. So I think that obviously there was no, we can see there was no interest before, but when that interest was created from that point forward, we think that it creates a well-founded fear of persecution. But how does that relate to Brown, who is not a member? So even if it was persecutorial as to other RUF members, why was it persecutorial to him, this sort of a missing link? No, well, Your Honor, I … They were going after him because he was a participant in the event in town. I think the context, his actions, how would they have known that he was not a member, given the actions that he undertook? I think that would have been very clearly that they would have imputed that political opinion to Mr. Brown as well. And obviously the severe mistreatment of his brother, his detention, that wasn't related just how long does it take for someone to state that they don't know the whereabouts of their father and their brother. If his brother was held for three days, perhaps longer, that was not just a detention for investigation purposes. Well, I think the difficulty … I thought that … Go ahead. I thought that your position was that he wasn't persecuted in the past, but that he had a reasonable fear of future persecution because of how they treated his family members. Yes, in part, Your Honor, that is correct. When I talk about detention, I'm referring to the brother of Mr. Brown. As far as the record shows, there was no past mistreatment of Mr. Douglas Brown. Okay. The only thing I related to was emotional suffering, which I guess he endured while there. But I think to follow up on Judge Gould's question, I think you may have the same concerns that I do. The problem with your case, it seems to me, is that it's a well-founded fear case. So what do we have in the record that you think is your best evidence that if your client were to return to Sarah Leon, that he would be persecuted based on his imputed beliefs because he's not an RUF member? Yes. I think the awareness by the Sarah Leon government of who he is, of his involvement in this activity, of his family's association with the RUF party, plus the similar actions, the Board of Immigration Appeals and the immigration judge sort of summarize the documentary evidence and say it's abysmal. I think if one looks closely at that, it's very apparent that any innocent civilian that's associated with RUF does not receive a trial. So perhaps the leaders do, but it appears that those who are in the field and are suspected of sympathies, they do not receive anything. They apparently are summarily executed. And Amnesty International, Human Rights Watch, each of these organizations documents that. So this past and present awareness, plus the sort of track record of the Sarah Leon government, I think lays a very strong compelling case that he has a well-founded fear of persecution. Any further questions? All right. Thank you. Thank you. Thank both of you for your arguments. No, we did.
judges: Thompson, Gould, Schwarzer